## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **16-02447-jw**
Adversary Proceeding Number:  **16-80046-jw**

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S REQUEST FOR SUMMARY JUDGMENT

The relief set forth on the following pages, for a total of 46 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**06/05/2017**



_John E Waites_

US Bankruptcy Judge
District of South Carolina

Entered: 06/05/2017

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re:<br><br>Chicora Life Center, LC,<br><br>          Debtor. | Case No. 16-02447-JW<br><br>Adv. Pro. No. 16-80046-JW<br><br>Chapter 11 |
| Chicora Life Center, LC,<br><br>          Plaintiff,<br><br>v.<br><br>Charleston County, a political subdivision of<br>South Carolina,<br><br>          Defendant. | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DEFENDANT'S REQUEST FOR SUMMARY JUDGMENT

This matter comes before the Court on the motion of plaintiff Chicora Life Center, LC, for partial summary judgment, and the defendant Charleston County's memorandum in support of summary judgment for defendant in its favor on plaintiff's claims. After reviewing the parties' respective briefs, the record in this adversary proceeding and in the main bankruptcy case, and considering the arguments of counsel, the Court grants in part and denies in part plaintiff's motion, denies defendant's request for summary judgment in its favor,[1] and makes the following Findings of Fact and Conclusions of Law.[2]

---

[1] On May 1, 2017, the Court made an oral ruling on the parties' respective motions. This Order represents a written expression of the Court's earlier oral ruling, memorializing and supplementing the same.

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

**I.      Prepetition Background and Facts Relative to the Relief requested.**

1.      Chicora Life Center, LC ("Chicora," "Debtor," or "Debtor-in-Possession"), owns a 400,000 square foot commercial real estate building located at 3600 Rivers Avenue, in North Charleston, South Carolina (the "Property").  The Property is Chicora's primary asset.

2.      On or about June 30, 2014, Chicora and Charleston County (the "County") entered into a contract (the "Lease") pursuant to which the County agreed to lease from Chicora approximately 98,000 square feet of space located in the Property ("Leased Premises").

3.      According to the Lease, Chicora intended for the County to serve as the "anchor" tenant for the Property.  The Lease also states that the County wished to rent the Leased Premises to relocate certain of its offices and programs,[3] "thereby assisting in the goals intended by Chicora . . . ."

4.      Article 2 of the Lease defined the "Effective Date" and provided, in relevant part:

[Chicora] hereby leases the Leased Premises to [County], and [County] hereby leases the same from [Chicora], for a term of twenty-five (25) years, beginning on the Effective Date of this Lease . . . . Effective Date shall mean the date [County] takes possession of the Leased Premises and all of the following events have occurred: (a) the City of North Charleston issues a Certificate of Occupancy for the Leased Premises; (b) the necessary licensing agencies have issued licenses for the Leased Premises; (c) certain improvements to the Leased Premises are completed in accordance with [County's] specifications and to [County's] reasonable satisfaction as provided for [Exhibits A through F of the Lease] (hereinafter collectively referred to as "Tenant Improvements"), (d) [Chicora] has provided an Irrevocable Letter of Credit to [County] in a form acceptable to [County] pursuant to the terms outlined in Article 22 and (e) [Chicora] has satisfied the conditions of the reverter clause.

---

[3] When the Lease was first executed, the County intended to relocate to the Leased Premises the Department of Alcohol and Other Drug Abuse Services ("DAODAS"), the Coroner's Office, and one of the South Carolina Department of Health & Environmental Control's ("DHEC") Vital Records offices.  After the Lease was executed, the Coroner's Office decided not to move to the Leased Premises.

5.      Article 2 further provided that when it completed the Tenant Improvements and satisfied the other preconditions to the Effective Date (described in Article 2), Chicora was to provide the County with written notice that the requirements of the Effective Date had been met, and that the Leased Premises were ready for occupancy ("Effective Date Notice").  The Lease further gave the County five (5) business days after receiving the Effective Date Notice to confirm to its satisfaction that the requirements of the Effective Date were met, and also provided a mechanism for the County to notify Chicora in the event it disagreed with the Effective Date Notice.

6.      Contemporaneous with the execution of the Lease, and pursuant to Article 4 of the Lease, the County tendered to Chicora the first month's rent in the amount of $92,821.

7.      The Lease originally contemplated that the Leased Premises would be available to the County on or before January 1, 2015 ("Original Day-Certain Deadline").  The lease term would commence upon the triggering of the Effective Date and delivery of the Leased Premises.

8.      The Lease did not expressly provide, in Article 2 or otherwise, that a failure to meet the deadline for triggering the Effective Date and delivery of the Leased Premises were grounds to terminate the Lease.

9.      Apparently agreeing more time was necessary to meet the preconditions to trigger the Effective Date (which was originally set for approximately 180 days after the parties entered into the Lease), on or around December 30, 2014, the parties executed a First Amendment to the Lease.  This amendment struck the Original Day-Certain Deadline and reaffirmed all other terms of the Lease ("First Lease Amendment").[4]  Thereafter, the parties never appear to have established

---

[4] Certain documents in the record suggest that the Lease was amended a second time; however, the record is not clear on this factor, nor were copies of any subsequent versions of the Lease included in the record by either party.

an agreed upon deadline by which Chicora had to make the Leased Premises available to the

County.[5]

10.    Article 19 of the Lease provides the conditions under which the respective parties

may be viewed as in default under the Lease.[6]

---

[5] While it appears that the parties exchanged various dates for a new day-certain deadline, it is clear that the Lease was never amended to reinsert a new, agreed upon, day certain.

[6] Article 19, "Events of Default," provides:

(a)    By Tenant: The occurrence of any one or more of the following events ("Events of Tenant Default") shall constitute a breach of this Lease by Tenant: (a) if Tenant shall fail to pay any rental or other sum when and as the same becomes due and payable and such failure shall continue for more than 30 days after written notice of such failure is received by Tenant from Landlord; or

(b)    if Tenant shall fail to perform or observe any other term hereof or of the rules and regulations described in Paragraph 14, "Compliance with Legal Requirements," to be performed or observed by Tenant, such failure shall continue for more than 30 days after written notice thereof is received by Tenant from Landlord and Tenant shall not within such period commence with due diligence and dispatch the curing of such default, or, having so commenced, shall thereafter fail or neglect to prosecute or complete with due diligence and dispatch the curing of such default; or (c) vacation or abandonment of the Leased Premises for a continuous period in excess of thirty (30) business days unless rent is current; (d) if this Lease or any estate of Tenant hereunder shall be levied upon under any attachment or execution against Tenant and such attachment or execution is not vacated within thirty (30) days; or (e) failure of Tenant to meet any provisions of this Lease.

The non-appropriation of funds or reduction in Leased Premises due to a change in the State DHEC mandate, as such are outlined in Article 54, Termination for Non Appropriation of Funds, shall not be considered Events of Default.

(b) By Landlord: The occurrence of any one or more of the following events ("Events of Landlord Default") shall constitute a breach of this Lease by Landlord: (a) if Landlord shall fail to pay any sum necessary to maintain the habitability of the Premises when and as the same becomes due and payable and such failure shall continue for more than 30 days after written notice of such failure is received by Landlord from Tenant; or (b) if Landlord shall fail to perform or observe any other term hereof or of the rules and regulations described in Paragraph 14, "Compliance with Legal Requirements," to be performed or observed by Landlord, such failure shall continue for more than 30 days after written notice thereof is received by Landlord from Tenant and Landlord shall not within such period commence with due diligence and dispatch the curing of such default, or, having so commenced, shall thereafter fail or neglect to prosecute or complete with due diligence and dispatch the curing of such default; or (c) vacation or abandonment of its obligations as Landlord for a continuous period in excess of thirty (30) business days; (d) if Landlord fails to separately meter the non-traditional heavy users of utilities in the Building prior to said non-traditional users occupation of the Premises, or (e) if Landlord sells the Premises and fails to have new Landlord agree to all terms and conditions outlined herein by signing a new lease with Tenant that has the same terms as outlined in this Lease; or (f) failure of Landlord to remain current with the costs and expenses associated with the Premises, including but not limited to, electricity, water, plumbing, resulting in Tenant's loss of power, water, sewer or the use of any and all electrical systems in Premises, Building, and/or Leased Premises; or (g) failure to indemnify Tenant as outlined in this Lease; or (h) failure to meet any of the provisions of this Lease.

11.     Article 20 of the Lease sets forth the procedure for addressing defaults; specifically, before terminating the Lease, the non-defaulting party must identify for the defaulting party the event of default, and provide the defaulting party with no less than 30-days written notice of the default, and a period of time within which to cure the default.  Article 20 further states that if the default is not cured by the date identified in the written notice, the "Lease shall terminate" on the date set forth in the written notice unless, among other things, "all breaches of the lease by [Chicora] . . . shall have been fully remedied to the satisfaction of the [County]." [7]

12.     Beginning in May 2015 and continuing thereafter until the County declared the Lease terminated on March 9, 2016, the parties exchanged various correspondences related to the triggering of the Effective Date.

13.     On May 1, 2015, Chicora sent the County notice that it had completed all of the requirements to trigger the Effective Date ("First Effective Date Notice").

14.     Upon receipt of the First Effective Date Notice, the County inspected the Leased Premises.  On May 8, 2015, the County gave Chicora written notice that it disagreed that the preconditions to the Effective Date had been met ("May 8 Letter").  In addition, the County provided Chicora with a list of deficiencies, and advised Chicora that it had 30 days to "complete the Tenant Improvements to a condition suitable for reasonable inspection by the County.  If Chicora fails to do so, the County will pursue any and all remedies available at law or in equity to sever all relationships with Chicora and recover all damages."

---

[7] Specifically, Article 20 provides:

This Lease shall terminate, unless on or before such date all items causing Default under this Lease and all costs and expenses incurred by or on behalf of [County] hereunder shall have been remedied to the satisfaction of [County] and/or paid by [Chicora] and all other breaches of this Lease by [Chicora] at the time existing shall have been fully remedied to the satisfaction of [County].

15.     While it appears that the parties engaged in discussions after the May 8 Letter, it does not appear from the record that the County took any action to assert or enforce a termination of the Lease upon the expiration of 30 days from the May 8 Letter or otherwise.[8]

16.     On June 17, 2015, Chicora sent correspondence to the County enclosing invoices for rent ("June 17 Letter").  This correspondence also included an invoice representing, "an estimated amount for the remaining work to be completed in order to finalize the DHEC licensing . . . ."  The letter advised the County that Chicora "require[d] written assurances [from the County] prior to spending additional funds to finalize the work . . . ."  Chicora further stated that, "[o]nce the County confirms in writing that, upon completion of the DHEC licensing, it plans to take possession and to acknowledge satisfaction of all conditions to the Effective Date, Chicora . . . will promptly complete the work . . . ."  The June 17 Letter gave the County a deadline of June 24, 2015 to respond.

17.     On June 24, 2015, the County wrote Chicora refusing to pay the rental invoices ("June 24 Letter").  Referencing its May 8 Letter, the County reiterated its position that several preconditions to triggering the Effective Date were not met, including the completion of certain Tenant Improvements.  In the June 24 Letter, the County also stated that notwithstanding these issues, the County would "continue to work with Chicora to determine how to resolve" the budget overruns, and stated that the County "fully intends to comply with the terms of the Lease to include occupying the facility once the preconditions of the Lease have been met."  The June 24 Letter asked Chicora to provide the County with "adequate assurances" of Chicora's ability to perform under the Lease, in the form of documentation from Chicora's lender that Chicora had access to sufficient funding to complete the preconditions of the Effective Date.  As further adequate

---

[8] Expiration of the 30-day deadline contained in the May 8 Letter was June 8, 2015 ("June 8 Deadline").

assurance, the County also asked for the date by which the preconditions would be completed. The June 24 Letter closed by advising Chicora that if it failed to provide the requested assurances by July 2, 2015, the County "will have no other alternative but to consider Chicora in default of the Lease."

18.     Chicora's response to the June 24 letter, if any, is not in the record, nor is any indication that the County took any action to assert a default, breach, or to terminate the Lease on July 2, 2015.

19.     On August 26, 2015, the County notified Chicora in writing that Chicora had failed to meet the requirements asserted in the May 8 Letter ("August 26 Letter").  The County further advised Chicora that if it failed to satisfy the preconditions of the Effective Date by November 1, 2015 (the "November 1 Deadline"), "the County will have no other alternative but to consider Chicora in breach of the Lease, and therefore, terminate the Lease."[9]

20.     It does not appear from the record that the County took any action on the November 1 Deadline or thereafter to assert or enforce the termination.  Instead, from November 1 Deadline, until it sent the Termination Letter on March 9, 2016, it appears that the County continued to treat the Lease as if it were still in effect.

21.     On December 21, 2015, Chicora sent the County a Second Effective Date Notice.

22.     In response to the Second Effective Date Notice, the County re-inspected the Leased Premises and on December 28, 2015, emailed Chicora, again disputing Chicora's contention that the Leased Premises were ready for occupancy.  In its December 28, 2015 communication, the County pointed to deficiencies in Tenant Improvements that were still

---

[9] It appears as though the County was relying on the 30-day notice provisions authorized in Article 20.  *See supra* n.7.

unresolved from the May 8 Letter, and noted that licenses for the Leased Premises had yet to be

obtained.  In this communication, the County made no mention of the August 26 Letter, the

November 1 Deadline, or the termination of the Lease.

23.      On January 6, 2016, the County wrote Chicora indicating a need for the parties to

reach a "comprehensive resolution of all of the outstanding issues," because of "the tenuous state

of the Lease and our relationship."  The County imposed a January 11, 2016 deadline for Chicora

to provide it and DHEC with final signed and sealed architectural drawings, and to provide the

County with Chicora's "best and final amount for the tenant improvement overage," Chicora

claimed was due.  This communication makes no mention of the August 26 Letter, the November

1 Deadline, or any prior termination of the Lease.

24.      On January 22, 2016, the County provided Chicora with a detailed list of continuing

project deficiencies ("Second Deficiency List").

25.      On February 3, 2016, the County of North Charleston issued final certificates of

occupancy for the Leased Premises.  This same day, Chicora sent the County a copies of the final

certificates of occupancy.  In this same letter, Chicora responded to the County's January 6, 2016

communication by advising that it did not yet have the final architectural drawings to submit, but

would have them soon.  In addition, in response to the County's request for Chicora's best and

final amount of any budget overages, Chicora stated that it was "ready and willing to negotiate in

good faith" regarding the issue, as provided for in the Lease.

26.      Having received final construction drawings, on March 3, 2016, DHEC issued a

Notice of Project Plan Approval of Chicora's construction documents and Approval Letter.

Chicora delivered these items to the County.

27.     On March 3, 2016, the County's Finance Committee met and recommended to County Council that the Lease be terminated.

28.     On March 8, 2016, without advance notice to Chicora, the County Council met and voted to terminate the Lease.

29.     On March 9, 2016, the County delivered to Chicora a written "Termination of Lease" ("Termination Letter").  The Termination Letter informed Chicora that the County "hereby terminates the Lease," because Chicora "failed to cure its default of fulfilling the preconditions and its obligations of the Lease," by failing "to make the Leased Premises ready for occupancy [and failing to] have the necessary licenses issued from the appropriate regulatory licensing agencies . . . ."  The Termination Letter makes no reference to any earlier correspondence, default, notice, or termination, nor any reference to the May 8 Letter, August 26 Letter, or the June 8 or November 1 Deadlines.

## II.     Procedural Background.

30.     On May 16, 2016 ("Petition Date"), Chicora filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Bankruptcy Case").  The record indicates that Chicora filed to address a number of debts, including that of its secured lender, UCF 1 Trust 1, which had instituted a foreclosure action.

31.     Upon the filing of the petition, Chicora became the Debtor-in-Possession, with fiduciary duties to the estate and its creditors.  *See* 11 U.S.C. § 1101.[10]

---

[10] Hereinafter, all references to provisions under the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, shall be by section number only.

32.    Contemporaneous with the filing of its petition, Chicora filed its bankruptcy schedules. Section 2.1 of Schedule G identifies the Lease with the County as an asset of Chicora's bankruptcy estate. Schedule G generally describes the Lease, and states it is for a term of 25 years.

33.    On May 17, 2016, Chicora filed the above-captioned, separate adversary proceeding against the County ("Adversary"). In its Complaint,[11] Chicora seeks to enforce its rights under the Lease. To this end, the Complaint asserts claims against the County for breach of contract and damages arising from the Termination Letter, and seeks a declaratory judgment that the County's termination of the Lease via the Termination Letter was improper and ineffective. The Complaint also seeks specific performance, damages, and other relief against the County.[12]

34.    On June 24, 2016, the County answered the Complaint,[13] denying that Chicora was entitled to the requested relief and asserting various defenses ("Answer"). The Answer also asserts counterclaims against Chicora for breach of contract,[14] a declaratory judgment that the Lease was "terminated, cancelled, rescinded, and/or invalid," and a claim for conversion (collectively "Counterclaims").[15] The Answer also contained a demand for a jury trial on all claims between

---

[11] The original complaint was amended on August 31, 2016, and again by consent on January 3, 2017. The original complaint, together with any amendments, will hereinafter be collectively referred to as the "Complaint."

[12] The Third through Fifth causes of action assert claims against the County for intentional interference with existing contracts, intentional interference with prospective contracts, and a claim for violation of the South Carolina Unfair Trade Practices Act.

[13] The County filed its answer and counterclaims: (a) to the original complaint on June 24, 2016; (b) to the amended complaint on September 7, 2016; and (c) to the second amended complaint on January 17, 2017. The answers and counterclaims will be collectively referred to herein as the "Answer."

[14] The County's breach of contract claim is premised on Chicora's failure to satisfy the preconditions to the Effective Date by the November 1 Deadline, its failure to make the Leased Premises ready for occupancy, and Chicora's refusal to refund the County's first month's rent deposit. The County seeks as damages for Chicora's breach the return of the rent deposit, as well as "costs and expenses, lost opportunity to sell another property, and other damages . . . ."

[15] The County's conversion claim arose out of Chicora's alleged possession of furniture and equipment purchased by the County ("Personalty"). The County sought monetary damages against Chicora and a return of the Personalty. In recent filings, the County has advised the Court that it has regained possession of the Personalty and therefore, it is no longer pursuing this claim.

the parties, and statements that the County did not consent to the entry of final orders or judgments by this Court.

35.    On June 16, 2016, counsel for the County electronically filed a notice of appearance and request for notice in the Bankruptcy Case ("Notice of Appearance"). The Notice of Appearance also purported to withhold the County's consent to this Court entering final orders in the Bankruptcy Case.[16] Counsel for the County electronically filed an identical Notice of Appearance in the Adversary on June 27, 2016.[17]

36.    On June 25, 2016, the County filed a Motion for Discretionary Abstention, asking this Court to issue an order pursuant to 28 U.S.C. § 1334(c)[18] abstaining from considering the Adversary ("Abstention Motion").

37.    On July 15, 2016, Chicora filed a plan and disclosure statement ("Original Plan and Disclosure Statement"). The Original Plan and Disclosure Statement provided that the County's

---

[16] The County's Notice of Appearance states:

Please take further notice that CHARLESTON COUNTY intends that neither this Notice of Appearance nor any later appearance, pleadings, claim, or suit shall waive (1) the right to challenge or object to the jurisdiction of the Court to enter final judgment on any matter, (2) the right to have final orders in non-core or *Stern* matters entered only after *de novo* review by the United States District Court, (3) the right to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to this case, (4) the right to have the United States District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal, or (5) any other rights, claims, actions, defenses, setoffs, or recoupment to which CHARLESTON COUNTY is or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, setoffs, or recoupment, which are expressly reserved.

[17] As a result of such an appearance, in addition to receiving notices by mail, counsel for the County also received electronic notice of documents filed in the Bankruptcy Case and Adversary via CM/ECF. *See* SC LBR 9036-1, which provides:

Electronic transmission of documents through CM/ECF to Registered CM/ECF Participants constitutes sufficient Notice of Judgment or Order pursuant to Fed. R. Bankr. P. 9022 and sufficient notice and service pursuant to applicable Federal Rules of Bankruptcy Procedure, except with respect to those documents to which the service requirements of Fed. R. Bankr. P. 7004 apply.

[18] Title 28 U.S.C. § 1334(c)(1) provides:

Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State Courts or respect for State Law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

claims arising from the Counterclaims would be treated as a member of Class 10, "General Unsecured Creditors," and that the County's rights would be impaired under the plan. In addition, Original Plan and Disclosure Statement provided for the following treatment for Chicora's executory contracts, which included the Lease:

> The Debtor intends to continue its normal operations in the ordinary course post-petition. Therefore, the Debtor shall assume all of the Executory Contracts, which Executory Contracts are shown in Schedule G of the Bankruptcy Schedules for the Debtor. Schedule G is also attached to this Disclosure Statement as Exhibit B, and there are not believed to be any cure amounts due as evidenced by the Debtor's Schedule F filed with the Court. Any and all cure amounts owed for Allowed Claims due to the assumption of Executory Contracts will be treated as Administrative Claims and will be paid in full as set forth in Class 4 hereinabove.[19]

The Original Plan and Disclosure Statement do not recognize, nor do they make a provision for the curing of, any nonmonetary defaults under any of Chicora's executory contracts.

38.    On July 22, 2016, on *ex parte* motion of Chicora, the Court entered an Order Conditionally Approving the Original Disclosure Statement, combining the final hearing for approval of the Original Disclosure Statement with the confirmation hearing for the Original Plan, and setting hearings on these matters for September 12, 2016.[20]   In addition, this Order set September 9, 2016 as the deadline for filing objections to confirmation of the Original Plan, and for filing ballots accepting or rejecting the Original Plan.

39.    On July 27, 2016, the Court entered in the Adversary its Order Setting Pre-Trial Hearing, and setting deadlines for the parties to conduct discovery and file motions ("Scheduling Order").[21]   The Scheduling Order provided, in relevant part:

---

[19] Schedule G is attached as "Exhibit B" to the Original Disclosure Statement.

[20] This common practice, ordered upon motion of the plan proponent, speeds up the confirmation process and is often elected in commercial cases.

[21] The Scheduling Order was amended from time to time, with the most current iteration of the order, filed on March 28, 2017. The Scheduling Order, and any amendments thereto, will be collectively referred to herein as the "Scheduling Order."

> On or before **September 30, 2016**, any party objecting to the entry of final orders
> or judgments by this court on any issue in this adversary proceeding, whether or
> not designated as "core" under 28 U.S.C. § 157(b), shall file with this Court a
> motion requesting that this Court determine whether this proceeding is a core
> proceeding or otherwise subject to the entry of final orders or judgments by this
> Court.  Any response to such a motion shall be filed and served on or before
> **October 15, 2016.  FAILURE OF ANY PARTY TO FILE A MOTION ON
> OR BEFORE THE DEADLINE PROVIDED IN THIS PARAGRAPH
> SHALL CONSTITUTE CONSENT BY SUCH PARTY TO THIS COURT
> ENTERING ALL FINAL ORDERS AND JUDGMENTS IN THIS
> PROCEEDING.**  Nothing in this paragraph limits this Court's ability to
> determine *sua sponte* whether this proceeding is a core proceeding under 28
> U.S.C. § 157(b)(3) or otherwise subject to entry of final order or judgment by
> this Court. [22]

No party filed a motion objecting to this Court's entry of final orders.

40.    On August 22, 2016, Chicora filed its objection to the Abstention Motion

("Debtor's Objection").  Therein, Chicora pointed to the fact that its Original Plan and Disclosure

Statement contemplated enforcement of the Lease which, "is central to the debtor's plan of

reorganization," and "a core component of the value of the bankruptcy estate."

41.    On August 30, 2016, the County filed a Reply to Debtor's Objection.

42.    On August 31, 2016, the Court conducted a hearing on the Abstention Motion.

After hearing the arguments of counsel, the Court took the matter under advisement.

43.    The County did not file either an objection to the Original Plan and Disclosure

Statement, nor did it file a ballot accepting or rejecting its proposed treatment under the Original

Plan.

44.    After a series of amendments and negotiations with creditors, on or about

September 9, 2016, and with the consent of all objecting parties, Chicora withdrew the Original

Plan and Disclosure Statement.

---

[22] Emphasis in original.

45.     On September 12, 2016, the Court entered an order requiring Chicora to file a new plan and disclosure statement on or before September 23, 2016.

46.     On September 23, 2016, Chicora filed a new plan and disclosure statement (collectively "Second Plan and Disclosure Statement").   The Second Plan and Disclosure Statement discuss at length the Adversary, and Chicora's intent to "aggressively pursue litigation of its claims against the County," including a claim for specific performance.  Although it takes into account the possibility that Chicora will not prevail in the Adversary, the Second Plan provides that Chicora's primary reorganization goal is to enforce the Lease being assumed by the Debtor-in-Possession, which will stabilize the Property's occupancy and generate revenues with which Chicora can repay its creditors.

47.     The Second Plan and Disclosure Statement provided treatment for the County's monetary claims arising from the Counterclaims as general unsecured claims, and also provided for the assumption of the Lease.  In fact, the proposed treatment of Chicora's executory contracts (including the Lease), and general unsecured creditors remained substantively unaltered from the Original Plan and Disclosure Statement.[23]

48.     On October 4, 2016, on the *ex parte* motion of Chicora and to expedite the confirmation process, the Court entered an Order conditionally approving the Second Disclosure Statement, combining the hearing for final approval of the Second Disclosure Statement with the confirmation hearing for the Second Plan, and scheduling the combined hearing on November 9, 2016.  This Order further fixed November 4, 2016 as the last day for filing objections to the Second

---

[23] In the Original Plan and Disclosure Statement, general unsecured creditors (including the County) were treated under Class 10.  In the Second Plan and Disclosure Statement, general unsecured creditors (including the County) were treated under Class 11.  Under both plans, the substantive treatment of general unsecured creditors was identical.

Disclosure Statement, for filing and serving written objections to confirmation of the Second Plan, and as the last day for filing ballots accepting or rejecting the Second Plan.

49.    The Second Plan and Disclosure Statement, and the above-discussed Order Conditionally Approving the Second Disclosure Statement and setting hearings, were properly served on creditors and parties in interest, including the County.

50.    On October 7, 2016, Chicora's primary lender, UCF 1 Trust 1, filed a motion asking the Court to dismiss the Bankruptcy Case, to appoint a Chapter 11 Trustee, or to convert the case to Chapter 7 (collectively "Dismissal Motion").    The hearing on the Dismissal Motion was scheduled for November 9, 2016, the same date as the confirmation hearing.

51.    Several creditors and the United States Trustee filed objections to the Second Plan and Disclosure Statement; however, despite the fact that the Second Plan and Disclosure Statement clearly proposed treatment of its claims and assumption of the Lease, the County did not file either an objection to the Second Plan or the Second Disclosure Statement, nor did it file a ballot accepting or rejecting the Second Plan.

52.    On October 28, 2016, the County filed a Supplement to Motion for Discretionary Abstention, "to address Chicora's [Second] Plan of Reorganization . . . ." ("Abstention Supplement").    In the Abstention Supplement, the County argued that, "Chicora appears to be trying to use the pendency of this Adversary Proceeding to forestall having to answer to its creditors, or to use the [Second] Reorganization Plan to induce this Court to pressure the County into reinstating the Lease — or both." Abstention Supplement at 1.    The Abstention Supplement acknowledged that, "Chicora's ultimate goals under its [Second] Plan . . . include four main components: (1) to stabilize occupancy of the Property by forcing the County to take possession of the Leased Premises . . . ." *Id*. at 1-2 (emphasis added).    The Abstention Supplement notes that,

"Chicora has admitted that it has not satisfied the conditions precedent to the Effective Date," and took the position that the "purported link between the adversary proceeding and [Second Plan and Disclosure Statement] is illusory."  The Abstention Supplement further stated:

> Notably absent from the [Second] Plan is any provision for Chicora to complete the contracted-for Tenant Improvements or to enable the County to obtain licensure of the Lease Premises, both of which were conditions precedent to the Effective Date of the Lease and the County's obligation to take occupancy and begin paying rent.
>
> . . .
>
> The [Second] Plan is silent on whether, when, or how Chicora intends to complete the Tenant Improvements and enable the necessary licensing.  Chicora underscores that the Adversary Proceeding will force the County to take possession of the Leased Premises . . . .

The Abstention Supplement does not address the Second Plan and Disclosure Statement's proposed treatment of its Counterclaims, nor does it address or directly acknowledge the provisions of the Second Plan related to the assumption of Executory Contracts.

53.    The statements in the Abstention Supplement make it clear that the County had actual notice of the Second Plan and Disclosure Statement, and therefore, the proposed treatment of the County's interests.

54.    The Abstention Supplement does not indicate that it is intended as an objection to confirmation of the Second Plan, nor does it ask the Court to deny confirmation of the Second Plan.  The Abstention Supplement was not filed in the Bankruptcy Case as required by the Court's Order, and the County did not request a further hearing on the issues raised in the Abstention Supplement.

55.    On November 4, 2016, Chicora, with the consent of its objecting creditors, asked the Court to continue the hearings scheduled for November 9, 2016, including the confirmation hearing.

56.     Based on repeated representations from Chicora that it was engaged in global settlement discussions, the Court continued the November 9 hearings to December 6, 2016, and again to January 4, 2017.  With the express consent of the County, the Court likewise continued other hearings scheduled in the Adversary.

57.     On December 14, 2016, based on the parties' representations that they were actively engaged in global settlement discussions, the Court entered its order removing the Abstention Motion from active consideration.  The Order provided that the matter could be restored to the Court's calendar upon written request of either party.

58.     On December 20, 2016, the parties filed a joint motion for an amended Scheduling Order to extend the period for discovery, for filing motions, for disclosure of experts, and for submitting a joint pretrial order.

59.     On December 29, 2016, Chicora submitted its ballot tally and an amendment to the Second Plan.  The County's treatment under the December 29 plan amendment remained unchanged.  Also on December 29, Chicora and those parties who had filed objections to the Second Plan submitted their Joint Statement of Dispute setting forth the contested issues for confirmation.  The County was not a party to the Joint Statement of Dispute, nor did it submit its own Joint Statement indicating any objection to the Second Plan.

60.     On January 4, 2017, the combined disclosure statement and confirmation hearing was held, at which time the Court granted Chicora's motion to extend the time to file ballots. Counsel for the County was present at the January 4 hearing and, together with counsel for Chicora, confirmed to the Court that the parties were engaged in settlement discussions.[24]  Also on January

---

[24] Prior to the conclusion of the January 4 hearing, the Court inquired of the parties present whether there were any other matters that they wished to bring to the Court's attention.  The following discussion ensued:

By Mr. Richard Farrier, special counsel to Chicora: . . . The purpose for this resolution was to allow us to dual track both to pursue a resolution.  And resolution could take several forms.  A

4, 2017, Chicora filed a further amendment to the Second Plan and Disclosure Statement to which

all objecting parties agreed.  This further amendment to the Second Plan and Disclosure Statement

did not alter the treatment of the Lease or the County's claims.

61.    On January 5, 2017, the Court entered an amended Scheduling Order, expressly

noting that the deadline for any party to object to the Court's final authority expired on September

3, 2016, and that no objections or motions were filed.

---

resolution with the County or a resolution through sale to the County or to a third party or maybe
re-letting the Premises.  We needed some time.  I just didn't want to confuse the Court because of
the nature of this case, that's going to take some time, and what counsel for the County realized and
we realized that under the current Scheduling Order we weren't going to be able to complete
discovery and we didn't want to put all our chips in one area and not the other.  So you are going to
see things happen, filings that show that we are still litigating . . . that should not be deemed an
indication that we have abandoned the settlement discussions . . . . So you are going to continue to
have to manage this litigation while we manage a resolution.

. . .

The Court: There is an issue that the County filed a motion for discretionary abstention in
regards to the presently pending litigation with the County.  That matter had been scheduled for a
previous hearing, but then the Court was advised of the potential global resolution, so we carried
things over.  Then we entered an order which just released it from the docket subject to its restoration
by any party within a certain time period by writing to the Court.  I guess I don't know whether that
matter should be restored for consideration, or should I await the writing of any party . . . ?

Mr. Farrier:  My understanding from discussions with Mr. Cooke, who's not here, his law
partner is, that issue was not going to be raised today, but might be raised in the future by writing to
the Court . . . .

The Court: In any event, the point being that we removed it from the docket; it's not under
advisement . . . [and] it's not being actively considered by the Court.  It's apparent to me today that
there's not a global resolution that involves the County, and so therefore, it will just sit there for that
period of time . . . and absent something being done within that period of time, we dismiss the
adversary . . . .

So if you restore it and you want further hearing you need to make that clear.  Sir, did you
want to say something?

By Mr. Jeff Bogdan: Yes Sir. Your Honor, Jeff Bogdan, I represent Charleston County in
the Adversary Proceeding.  I just want to say that we would agree to submit to the previous
procedure of the Court that we would notify the Court in writing if and when we want that motion
to be put back on the docket.

Court: Very Good.  That's very satisfactory to me.  And so I'll just stand at ease until you
need further in that matter.

The County has since disclaimed any statement or representation that it was actively involved in settlement discussions
with Chicora during this time period, instead indicating its understanding that Chicora was actively negotiating with
other creditors, and would get to the County at a later date.

62.     On January 10, 2017, the Court entered an order confirming the Second Plan filed on September 23, 2016, as amended (hereinafter the "Confirmed Plan") and affording creditors a further period of time to file written objections to the Confirmed Plan.  The Order Confirming the Confirmed Plan, among other things, provides that the requirements for confirmation of the Confirmed Plan under § 1129 have been met, and provides that this Court retains jurisdiction until entry of the final decree ("Confirmation Order").

63.     The Confirmation Order, together with Notice of Revised Plan terms, the Confirmed Plan and Disclosure Statement, as amended, were served on all creditors and parties in interest, including the County.

64.     No objections were filed to the Notice of Revised Plan terms.  Consequently, the Confirmation Order became a final Order of the Court.

65.     On January 10, 2017, the County asked the Court to restore consideration of the Abstention Motion to its calendar.  This request was granted by a text order entered on January 12, 2017.  The County did not ask the Court to schedule a further hearing on the Abstention Motion or the Abstention Supplement.

66.     On or about January 19, 2017, Chicora filed a motion for partial summary judgment, seeking summary judgment in its favor on its Second and Sixth Causes of Action (Declaratory Judgment and Specific Performance) ("Chicora Motion").

67.     On or about February 1, 2017, Chicora moved to extend the deadline for it to disclose its experts.  The County consented to the motion, and thereafter the Court granted the motion by Order entered on February 2, 2017.

68.     On February 9, 2017, the Court entered its order denying the County's Abstention Motion ("Abstention Order").[25]  This ruling was, in part, based on the fact that the Lease was a central feature of not only Chicora's reorganization efforts, but if Chicora was not successful in the litigation, both the value of the Premises and Chicora's ability to successfully reorganize and pay its creditors would be in jeopardy.

69.     The Abstention Order further recognized the fact that, when it asserted the Counterclaims seeking damages against Chicora, the County triggered the claims allowance process and likely waived any right it might have had to a jury trial.  *See* Abstention Order at 7-8.

70.     On February 21, 2017, the County filed its "Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Summary Judgment for the Defendant" (collectively "County's Motion").  In addition to asking the Court to deny Chicora's Motion, the County's Motion asks the Court for affirmative relief, the granting of summary judgment in its favor pursuant to Rule 56(f)(1).[26]

71.     On March 1, 2017, the Court conducted a hearing on the parties' motions.  At the hearing, counsel for the County confirmed on the record the County's desire that the Court grant the County summary judgment on Chicora's claims.

---

[25] On February 23, 2017, the County filed a Notice of Appeal of the Abstention Order, and related Motion for Leave to Appeal.  On April 25, 2017, the District Court entered its Order denying the County's Motion for Leave to Appeal.

[26] Federal Rule of Civil Procedure 56(f) provides:

(f) Judgment Independent of the Motion. After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant the motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

## CONCLUSIONS OF LAW

**I.    Jurisdiction and Final Authority.**

This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

As a threshold matter, the Court must determine whether it has statutory and constitutional

authority to enter final orders in this Adversary, or whether the Court is limited to entering

proposed findings of fact and conclusions of law for review by the District Court. *See* 28 U.S.C.

§ 157(c)(1). For the following reasons, the Court finds that it has the authority to enter final

judgments in this matter.

The Court first examines whether the claims in the Adversary involve core matters,[27] on

which the Court has statutory authority to rule, or non-core matters on which, without the parties'

consent, the Court may not enter final orders.[28]  A review of the pleadings reveals that the parties

---

[27] Congress has provided a non-exhaustive list of core proceedings under 28 U.S.C. § 157(b)(2), which
provides, in relevant part:

> (2) Core proceedings include, but are not limited to-- . . .
>
> (B) allowance or disallowance of claims against the estate . . .
>
> (L) confirmations of plans; . . .
>
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the
> debtor-creditor or the equity security holder relationship, . . . .

"Engrafted upon all of [the matters identified as core] is an overarching requirement that property of the estate under
§ 541 be involved." *Continental Nat'l Bank of Miami v. Sanchez* (*In re Toledo*), 170 F.3d 1340, 1348 (11th Cir. 1999).
A matter is a "core proceeding" "arising under" Title 11 if it is one that, by its nature, could arise only in the context
of a bankruptcy case.  *See C.F. Trust, Inc. v. Tyler*, 318 B.R. 795, 803 (E.D. Va. 2004) (citing *In re Wood*, 825 F.2d
90, 97 (5th Cir. 1987) ("a proceeding is core . . . if it is a proceeding that, by its nature, could arise only in the context
of a bankruptcy case.")).

Even if a proceeding is non-core, this Court may adjudicate it if the parties expressly or implicitly consent.
*See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947–48 (2015).  The consent, when given, must "be
knowing and voluntary."  *Id.* at 1948.

[28] As explained by the Supreme Court:

> Bankruptcy judges may hear and enter final judgments in "all core proceedings arising under title 11,
> or arising in a case under title 11." § 157(b)(1). "Core proceedings include, but are not limited to" 16
> different types of matters, including "counterclaims by [a debtor's] estate against persons filing
> claims against the estate." § 157(b)(2)(C) . . . . When a bankruptcy judge determines that a referred
> "proceeding . . .  is not a core proceeding but . . . is otherwise related to a case under title 11," the
> judge may only "submit proposed findings of fact and conclusions of law to the district court."

dispute whether the six claims asserted by Chicora against the County are core.[29]  *See generally*

*Stern v. Marshall*, 564 U.S. 462, 499 (2011) (recognizing the difference between actions that seek

to "augment" a bankruptcy estate and those that "seek 'a pro rata share of the bankruptcy res'")

(internal citation omitted).  Regardless, the Counterclaims asserted by the County appear to be

core matters.

The County's breach of contract claim is a core matter under 28 U.S.C. § 157(b)(2)(B)

because it involves the County's assertion of a claim[30] against the estate that implicates the claims

adjudication process and thus, the restructuring of debtor-creditor relations.  Specifically, with its

breach of contract claim, the County expressly seeks monetary damages from Chicora and, in

doing so, manifests its request for its *pro rata* share of the bankruptcy *res.  See Granfinanciera,*

*S.A. v. Nordberg,* 492 U.S. 33, 58 (1989) (by filing a claim against a bankruptcy estate, the creditor

triggers "the process of allowance and disallowance of claims," thereby subjecting himself to the

bankruptcy court's equitable power); *Langencamp v. Culp*, 498 U.S. 42, 44-45 (1990) (same); *see*

*also In re Professional Facilities Mgmt. Inc.*, 2015 WL 6501231, at *5 (Bankr. M.D. Ala. 2015)

---

§ 157(c)(1). It is the district court that enters final judgment in such cases after reviewing de novo
any matter to which a party objects.

*Stern v. Marshall*, 564 U.S. 462, 474–75 (2011).

[29] The Complaint asserts claims against the County for breach of contract and related damages arising from
the Termination Letter, declaratory judgment that the attempted termination on March 9 was improper and ineffective,
and specific performance under the Lease.  The remaining causes of action assert claims against the County for
intentional interference with existing contracts, intentional interference with prospective contracts, and a claim for
violation of the South Carolina Unfair Trade Practices Act.

[30] The Bankruptcy Code defines a "creditor" as an "entity that has a claim against the debtor." 11 U.S.C.
§ 101(10)(A).  A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment,
liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or
unsecured . . . ." 11 U.S.C. § 101(5)(A).

A review of the legislative history makes it clear that Congress intended to create a broadly inclusive
definition of a "claim" that encompassed "all legal obligations of the debtor, no matter how remote or contingent." S.
Rep. No. 95–989, 95th Cong., 2d Sess. 309 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6266; *see also Signmon v.*
*Royal Cake Co.* (*In re Cybermech, Inc.*), 13 F.3d 818, 821 (4th Cir. 1994) ("Congress gave the 'broadest possible
definition' to the term 'claim' in order to ensure that 'all legal obligations of the debtor, no matter how *remote* or
*contingent,* [would] be dealt with in the bankruptcy case.'") (internal citations omitted; emphasis in original).

("Regardless of the ultimate characterization of the counterclaim . . . the courts' chief concern has been whether the counterclaimant was seeking to achieve an affirmative recovery from the estate by circumventing the bankruptcy court's formal claims allowance procedure.") (citing *Container Recycling All. v. Lassman*, 359 B.R. 358, 362 (D. Mass. 2007)).

Although a breach of contract claim is a legal claim, ordinarily entitling the County to a jury trial, when raised in a bankruptcy case, the once legal claim converts to one in equity, and the right to a jury trial is lost. *In re Concept Clubs, Inc.*, 154 B.R. 581, 589 (Bankr. D. Utah 1993) (when a claimant asserts a counterclaim seeking affirmative relief against the estate, the claimant necessarily submits to the equitable jurisdiction of the bankruptcy court). Thus, by asserting in the Counterclaims against Chicora's bankruptcy estate and requesting affirmative relief against the estate, including an award of monetary damages, the County invoked the claims adjudication process. *See Katchen v. Landy*, 382 U.S. 323 (1966) (a claim for damages against the bankruptcy estate is a matter over which the bankruptcy court has exclusive control).

Likewise, the County's request for declaratory judgment is a core matter under 28 U.S.C. § 157(b)(2) because adjudication of this cause of action will necessarily impact the administration of the estate – particularly the Confirmed Plan. This counterclaim also requires a determination by this Court whether or not a claimed asset of the estate (*i.e.* the Lease) exists. *See* 11 U.S.C. § 541 ("property of the estate is all legal or equitable interests of the debtor in property"); *In re Baltimore Marine Indus.*, 476 F.3d 238, 240 (4th Cir. 2007) (discussing the broad definition of property of the estate); *see also In re Rickle Home Centers, Inc.*, 209 F.3d 291, 300 (3d Cir. 2000) (holding that unexpired leases and executory contracts are property of the estate).

Because the adjudication of the County's breach of contract and declaratory judgment claims will necessarily resolve, on the merits, Chicora's competing breach of contract and

declaratory judgment claims,[31] adjudication of these matters is within the core jurisdiction of this Court.

Finally, the Court will note that, because each of the Counterclaims arose prepetition, under Bankruptcy Rule 7013,[32] the County was not required to assert the Counterclaims in the Adversary. Instead, in response to the Complaint, the County could have filed only an answer. Having chosen to voluntarily assert claims against the estate in the Adversary, the County cannot now complain of the procedural consequences.[33]

Having determined that it has statutory authority to hear this matter, the Court next considers constitutional authority. As a non-article III court, this Court does not have constitutional authority to enter a final judgment on certain claims unless the litigants consent. *Wellness Int'l Network, Ltd. v. Shariff*, 135 S. Ct. 1932, 1940 (2015). Consent to this Court's entry of a final judgment can be express or implied. *Id.* at 1948. "[T]he key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the non-Article III adjudicator." *Id.* (quoting *Roell v. Withrow*, 538 U.S. 580, 590 (2003)).

---

[31] The parties' competing breach of contract and declaratory judgment claims arise out of the same transaction, and are based on the duties and obligations allegedly established by the Lease, and their resolution requires an interpretation and enforcement of the Lease. Thus, the process of adjudicating the County's breach of contract claim and demand for damages, and its request for declaratory judgment, will necessarily resolve Chicora's competing claims for breach of contract and declaratory judgment. *See, e.g., Katchen*, 382 U.S. at 329-30 (summary adjudication by the bankruptcy court is appropriate because it was impossible for the court to rule on the creditor's claim without first determining whether the creditor had received a voidable preference).

[32] Bankruptcy Rule 7013 provides that, "a party sued by a trustee or debtor in possession need not state as a counterclaim any claim that the party has against the debtor, the debtor's property, or the estate, unless the claim arose after the entry of an order for relief."

[33] It appears from several of its pleadings that the County is under the mistaken belief that by selectively ignoring the proceedings in the Bankruptcy Case, it can be "excluded" from the impact of events and orders in the Bankruptcy Case. This belief is incorrect as matter of law.

In its Notice of Appearance and Answer submitted early in the Adversary, the County purported to withhold its consent to this Court's final authority. However, at other times, the County either expressly or impliedly consented to this Court's final authority by voluntarily appearing to request relief from this Court.

In response thereto, and in order to efficiently administer the litigation of the Adversary, the Court, by a clear and bold provision in its Scheduling Order, required any party who wished to maintain an objection to final authority to file a motion and to state the basis for its position, for determination on the merits. In the event that the Court lacked final authority, the parties or the Court *sua sponte*, would then have the option to seek withdrawal of the reference to the District Court to more efficiently conclude this litigation, and to reduce delay and expense.

In addition, and because of the importance of this issue for the parties, the Scheduling Order explicitly provided:

**FAILURE OF ANY PARTY TO FILE A MOTION ON OR BEFORE THE DEADLINE PROVIDED IN THIS PARAGRAPH SHALL CONSTITUTE CONSENT BY SUCH PARTY TO THIS COURT ENTERING ALL FINAL ORDERS AND JUDGMENTS IN THIS PROCEEDING.**

(Emphasis in original).

Despite its actual knowledge of its right to challenge final authority, and its knowledge of the terms of the Scheduling Order and the consequences of failing to comply with the deadlines contained therein, the County never affirmatively sought a determination of this issue by the Court before the deadline set forth in the Scheduling Order. As a consequence, the County is deemed to have consented to this Court entering all final orders and judgments in this Adversary.

In response to Chicora's Motion, the County filed its own request for summary judgment regarding the validity of the Lease, asserting that it was terminated prepetition (*i.e.* the County's Motion). Absent from the County's Motion, which requested judgment in its favor, is any mention

of the County withholding consent to this Court's exercise of final authority. To confirm the

County's express desire that the Court adjudicate the issues before it, at the March 1 summary

judgment hearing, the Court expressly asked counsel for the County whether the County was

asking the Court to grant it judgment on the County's Motion. Counsel answered in the affirmative.

[34] In this manner, the County expressly consented to the Court's jurisdiction and final authority to

issue this Order ruling on Chicora's Motion.

A party's entitlement to an Article III adjudicator is "a personal right," that, like any

personal right, is "subject to waiver," *Commodity Futures Trading Comm'n v. Schor*, 478 U.S.

833, 848 (1986). As recognized by the Supreme Court:

> Nothing in the Constitution requires that consent to adjudication by a bankruptcy
> court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate
> express consent; it states only that a bankruptcy court must obtain "the
> consent"—consent simpliciter—"of all parties to the proceeding" before hearing
> and determining a non-core claim. § 157(c)(2). And a requirement of express
> consent would be in great tension with our decision in *Roell v. Withrow*, 538
> U.S. 580 (2003).
>
> . . .
>
> The implied consent standard articulated in *Roell* supplies the appropriate rule
> for adjudications by bankruptcy courts under § 157. Applied in the bankruptcy
> context, that standard possesses the same pragmatic virtues—increasing judicial
> efficiency and checking gamesmanship—that motivated our adoption of it for
> consent-based adjudications by magistrate judges. *See id.*, at 590. It bears
> emphasizing, however, that a litigant's consent—whether express or implied—
> must still be knowing and voluntary. *Roell* makes clear that the key inquiry is

---

[34] One example of the County's express consent occurred during the summary judgment arguments:

THE COURT:    So you believe all the evidence and arguments support not only the denial of
summary judgment, but the granting of summary judgment in favor of the County?

MR. COOKE:    Yes, Your Honor.

THE COURT:    Okay.

MR. COOKE:    Rule 56 provides for that.

THE COURT:    All right, sir.

MR. COOKE:    It says the court may grant summary judgment even for the nonmoving party.

Transcript of March 1, 2017 Hearing at 41, lines 13 through 21.

whether "the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case" before the non-Article III adjudicator.

*Wellness*, 135 S. Ct. at 1947-48.

It is apparent from its Notices of Appearance, Answer and Counterclaims, and various other pleadings filed in this action, that the County knew of its right to withhold consent to this Court's entry of final orders on Chicora's claims and initially withheld its consent.  It is also clear that the County knew of the right to refuse adjudication by a non-Article III Court based on the deadlines for filing motions set forth in bold typeface in the Scheduling Order.

Notwithstanding its knowledge of these factors, the County, both by implication and by express consent, knowingly and voluntarily submitted itself to final adjudication by this Court of the merits of the issues raised in the Adversary, including its Counterclaims.

Finally, as described below, the County's failure to object to the assumption of the Lease as provided for in the Confirmed Plan confirmed on January 10, 2017, precludes the County from further objecting to this Court's final authority on certain issues related to the validity of the Lease.[35]  Confirmation of a debtor-in-possession's chapter 11 plan, and approval of a debtor-in-possession's assumption or rejection of executory contracts pursuant to § 365 are, as a matter of law, core matters that arise under the Bankruptcy Code.  Indeed, confirmation of a plan lies at the heart of "the restructuring of the debtor-creditor relations, which is at the core of the federal bankruptcy power . . . ."  *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982).  Plan confirmation and the assumption of an executory contract pursuant to § 365 both involve substantive rights created by the Bankruptcy Code that can only arise in bankruptcy.  *See*

---

[35] As discussed below, confirmation of a chapter 11 plan providing for the assumption of a lease, without recognition of prepetition defaults or breaches, necessarily prohibits their further assertion by the counterparty to the lease due to the *res judicata* or binding effect of an order confirming a chapter 11 plan under § 1141.

*Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate,") (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).

Likewise, jurisdiction of the bankruptcy court extends more broadly in the context of a reorganization under Chapter 11, as opposed to a Chapter 7 liquidation. *Celotex Corp. v. Edwards*, 514 U.S. at 310. As a result, the Court's authority does not end with entry of a confirmation order. At a minimum, post-confirmation, the Court has jurisdiction to rule on implementation or interpretation of the plan. *See Highland Cap. Mgmt. LP v. Chesapeake Energy Corp.* (*In re Seven Seas Petroleum, Inc.*), 522 F.3d 575, 589 (5th Cir. 2008) (holding that a bankruptcy court's post-confirmation "jurisdiction extends to matters that 'impact compliance with or completion of the reorganization plan.'" (internal citation omitted)); *Fairfield Cmtys., Inc. v. Daleske* (*In re Fairfield Cmty., Inc.*), 142 F.3d 1093, 1095 (8th Cir. 1998) (if provided for in an order confirming a plan, "the bankruptcy court may explicitly retain jurisdiction over aspects of a plan related to its administration and interpretation," (internal citation omitted)); *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 323-24 (Bankr. D. Del. 2005) (when a confirmed plan specifically describes an action over which the Court had pre-confirmation, related to jurisdiction, and contemplates the prosecution of the claim for the benefit of the estate's creditors, there is a sufficiently close nexus with the bankruptcy case to support the court's post-confirmation jurisdiction).

A proceeding to assume an executory contract pursuant to § 365, is "inherently [a] Bankruptcy Code created core proceeding," that arises under Title 11 of the United States Code, and over which this Court has final authority. *In re Dunes Hotel Assocs.*, 194 B.R. 967, 992–93 (Bankr. D.S.C. 1995) (citing *Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d

1043, 1048 (4th Cir. 1985), *cert. denied*, 475 U.S. 1057 (1986) and *In re Nexus Commc'ns, Inc.*,

55 B.R. 596, 598 (Bankr. E.D.N.C. 1985) (actions to assume or reject executory contracts under §

365 are "core" proceedings)). Chicora's assumption of the Lease implicates the outcome of the

Adversary because Chicora's assumption of the Lease in its Confirmed Plan pursuant to § 365

determines any further arguments related to the alleged prepetition defaults or breaches under the

Lease.

Based upon the foregoing facts and authorities, the Court finds that it has final authority to

determine the issues regarding the Lease in this Adversary.

## II.    Summary Judgment Standard.

Federal Rule of Civil Procedure 56, made applicable in this adversary proceeding by

Bankruptcy Rule 7056, provides that, "[t]he court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." "One of the principal purposes of the summary judgment rule is to isolate and

dispose of factually unsupported claims or defenses, and . . . [the rule] should be interpreted in a

way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24

(1986).

"When a motion for summary judgment is filed, the Court does not weigh the evidence,

but determines if there is a genuine issue for trial." *In re Ducane Gas Grills, Inc.*, 320 B.R. 324,

331-32 (Bankr. D.S.C. 2004) (citing *Listak v. Centennial Life Ins. Co.*, 977 F. Supp. 739, 743

(D.S.C. 1997)).

All evidence must be viewed in a light most favorable to the nonmoving party. (*Matsushita

Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)), and once the movant has

met its burden, the opposing party must come forward with "any of the kinds of evidentiary

materials listed in Rule 56(c)," and to designate "specific facts showing that there is a genuine

issue for trial**.**" *Celotex Corp. v. Catrett*, 477 U.S. at 324; *Matsushita*, 475 U.S. at 587; *In re*

*Ducane Gas Grills, Inc.* 320 B.R. at 332 (citing Fed. R. Civ. P. 56(e) and *Matsushita*).

"Only disputes over facts that might affect the outcome of the suit under governing law

will property preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "[T]here is

no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to

return a verdict for that party . . . . If the evidence is merely colorable or is not significantly

probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

"If no material factual disputes remain, then summary judgment should be granted against

a party who fails to make a showing sufficient to establish the existence of an element essential to

that party's case and on which the party bears the burden of proof at trial." *Listak*, 977 F. Supp. at

743 (citing *Celotex Corp. v. Catrett*, 477 U.S. at 323).

## III. Termination of the Lease.

After consideration of the record and arguments in this matter, the Court finds that the

Lease was not effectively terminated prepetition by the County due either to the County's waiver

of its right to assert default/breach before issuing the Termination Letter, and/or its failure to

comply with the notice requirements arising under terms of the Lease or imposed by South

Carolina law.  Without prepetition termination of the Lease, as a result of the Confirmed Plan,

which is binding on the County, the Lease was assumed by Chicora as the Debtor-in-Possession.

### A.  Parties' requests for Declaratory Judgment.

In their pleadings and motions, each party asks the Court to rule on the effect on the Lease,

if any, of the Termination Letter.  To begin, the Court notes that the effect of the Termination

Letter raises a justiciable controversy that is ripe for determination by declaration from this Court.

The Declaratory Judgments Act provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the United
> States, upon the filing of an appropriate pleading, may declare the rights and other
> legal relations of any interested party seeking such declaration, whether or not
> further relief is or could be sought.  Any such declaration shall have the force and
> effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a).  Chicora's request is also based upon the South Carolina Uniform Declaratory

Judgments Act, S.C. Code Ann. § 15-53-10 *et seq.*, which provides:

> Courts of record within their respective jurisdictions shall have power to declare
> rights, status and other legal relations whether or not further relief is or could be
> claimed. No action or proceeding shall be open to objection on the ground that a
> declaratory judgment or decree is prayed for. The declaration may be either
> affirmative or negative in form and effect. Such declarations shall have the force
> and effect of a final judgment or decree.

S.C. Code Ann. § 15-53-20 (2017).

### B.     Absence of Deadline for the Effective Date.

As its primary basis for termination, the County asserts Chicora's inability to ready the

Leased Premises for occupancy and thereby trigger the Effective Date.  It appears that the Lease

originally set a specific date and deadline for the Effective Date, a date approximately 180 days

after the execution of the Lease.  However the parties, recognizing that more time was necessary,

voluntarily removed the Original Day-Certain Deadline without agreeing on another.[36]

The Lease, in its original form, did not expressly indicate that a failure to meet the deadline

to trigger the Effective Date or deliver the premises by a specified date was a basis for termination

of the Lease.  Likewise, neither Article 19 or 20 expressly provide that a failure to trigger the

Effective Date was a basis for default and termination.

Without such an agreed upon deadline or consequence, South Carolina law supplies the

standard for terminating the Lease.  *See generally*, *Kiriakides v. United Artists Communications,*

---

[36] The record indicates evidence that construction projects of this size may take 1 to 2 years to complete the
upfitting of the premises.

*Inc.*, 440 S.E.2d 364, 366-37 (S.C. 1994) (setting forth the test for determining when a breach of a commercial lease is material enough to justify termination).  In addition, under South Carolina law, "[f]orfeiture provisions of a lease are strictly construed and when a forfeiture depends upon giving a written notice of default, it must appear that the notice was given in strict compliance with the contract both as to time and content."  *Litchfield Co. of S.C., Inc. v. Kiriakides*, 349 S.E.2d 344, 347-48 (S.C. Ct. App. 1986) (internal citations omitted).

Thus, the effectiveness of the Termination Letter must be determined with reference to the Lease and South Carolina law.  *See* 11 U.S.C. § 365(c)(3) (debtor-in-possession may not assume a lease of nonresidential real property if the lease was terminated prepetition under applicable nonbankruptcy law); *In re Shangra–La, Inc.*, 167 F.3d 843 (4th Cir. 1999) (bankruptcy law grants a debtor-in-possession the right to assume or reject unexpired leases, but the parties' rights and obligations under the assumed lease are determined with reference to the lease and state law); *In re Greenville Am. Ltd. P'ship*, 2000 WL 33710874, at *4 (Bankr. D.S.C. 2000) (unpublished). Under South Carolina law, when a contract is silent as to the time for performance, time is not of the essence and the law presumes that performance must be accomplished in a reasonable time, according to the circumstances of the case.  *Drews Co., Inc. v. Ledwith-Wolfe Assocs., Inc.*, 371 S.E.2d 532, 533 (S.C. 1988) (citing *Davis v. Cordell*, 115 S.E.2d 649, 654 (S.C. 1960); *Cloniger v. Cloniger,* 193 S.E.2d 647, 651 (S.C. 1973) (applying "reasonable time" rule to agreement to repurchase property within an unspecified time); and *Smith v. Spratt Machine Co.,* 24 S.E. 376, 377 (S.C. 1896) (when manufacturing contract specified no time for performance, a "reasonable time" is implied, taking into consideration the situation and circumstances of the parties)); *General Sprinkler Corp. v. Loris Indus. Developers, Inc.*, 271 F. Supp. 551, 557-58 (D.S.C. 1967) (when no time for performance is set in a contract, it must be performed within a reasonable time, and

before the contract may be cancelled for non-performance, "express, unequivocal and reasonable notice must be given . . . .").

While time of performance can be made of the essence by one party giving his counterparty notice that he demands performance by a day certain,[37] when such a demand is made, notice of the time allowed for the counterparty to perform must be reasonable. *See Bishop v. Tolbert*, 153 S.E.2d 912, 918 (S.C. 1967) ("Time may be made of the essence by one party giving notice to the other that he will insist on a strict performance, or, . . . that he will insist on performance by a certain date, provided the time allowed by the notice is reasonable, which is a question of fact depending on the circumstances of the particular case."). In addition, when attempting to terminate a contract that lacks a definite deadline for performance, South Carolina law requires that reasonable notice be given prior to termination. What constitutes "reasonable notice" must be determined by the facts of each case, and the nature and circumstances of the contract involved. *General Info. Servs., Inc. v. LP Software, Inc.*, 2009 WL 1743900, at *10 (D.S.C. 2009). No notice, or notice of an immediate termination, is unreasonable under any set of circumstances. *Id.*; *see also General Sprinkler Corp.*, 271 F. Supp. at 558 (before terminating or attempting to terminate a contract missing a definite deadline for performance, the counterparty must give, "express, unequivocal, and reasonable notice."); *deTreville v. Outboard Marine Corp.,* 439 F.2d 1099, 1100 (4th Cir. 1971) (party terminating a contract commits an actionable wrong if the manner of termination is contrary to equity and good conscience).

As discussed above, when executed, the Lease required Chicora to satisfy the preconditions to the Effective Date and give the County possession of the Leased Premises on or before January

---

[37] While language in the Lease says that "time is of the essence," the parties removal of the Original Day-Certain Deadline and their failure to agree on a new day certain deadline leaves contractual uncertainty and requires application of the reasonableness standard.

1, 2015.  By agreement, memorialized in the First Lease Amendment, the parties struck January 1, 2015 as the day certain for possession.  Thereafter, although both parties offered and discussed different deadlines for completion, the Lease was not subsequently amended, and there is no completion date in the Lease.

C. **Analysis of the purported termination on March 9.**

Construing the original Lease, it appears that the Original Day-Certain Deadline was the necessary basis on which the County could assert any complaint that the Leased Premises were not made ready in a timely fashion.  Because the Lease (as amended) contains no deadline for completion of the preconditions to the Effective Date, Chicora was required to perform its obligations within a reasonable time, with that time to be determined based upon the circumstances of the case.

In support of its position that its March 9 termination was justified, the County directs the Court's attention to *In re Greenville American Limited Partnership*,[38] for the proposition that Chicora's failure to perform pursuant to Article 2 of the Lease "in a reasonable time," was a material breach of the Lease that justified the County's March 9 termination.  However, the County's reliance on *Greenville American* is misplaced.

In *Greenville American*, this Court was asked to determine the validity of a tenant's prepetition termination of a commercial lease.  On December 1 the tenant, TriVergent, gave the debtor-landlord Greenville American ten days' written notice (as required by the lease) of its intent to exercise its right to terminate a commercial lease due to debtor's failure to complete tenant improvements by the day certain deadline contained in the parties' lease.  In response, and in an attempt to stay the effect of the notice, Greenville American filed Chapter 11 nine days after the

---

[38] 2000 WL 33710874 (Bankr. D.S.C. 2000) (unpublished).

notice was sent, then moved to assume the parties' lease. TriVergent objected to debtor's assumption motion, arguing that it had terminated the lease prepetition.

Denying the debtor's motion to assume, this Court found that TriVergent's termination of the lease was complete prepetition. The Court further found that the termination provisions of the parties' lease were self-effectuating, and gave TriVergent the right to terminate the lease upon the non-occurrence of a condition.

Like the tenant TriVergent, the County asserts that Chicora's failure to complete the tenant improvements is a material breach, entitling it to terminate the lease. However, the County ignores several significant factual distinctions between its Lease and the *Greenville American* lease. First, the *Greenville American* lease contained a day certain deadline by which tenant improvements had to be completed. This Lease (after its amendment) does not. The *Greenville American* lease contained express provisions that provided that upon the debtor's failure to complete the tenant improvements by the day certain deadline, TriVergent was entitled to terminate the lease upon ten days' written notice. This Lease contains no similar provision.

Because of the nature of the parties' relationship, and the facts and circumstances of this case (in particular the County's repeated indications, as late as January 22, 2016,[39] that Chicora should continue to perform to trigger the Effective Date), and pursuant to South Carolina law, Chicora was entitled to reasonable notice of the County's decision to terminate the Lease. However, the Termination Letter did not give Chicora reasonable notice; rather, it purported to give Chicora notice, effective immediately, that the Lease was terminated. This, as a matter of law, was unreasonable. *General Sprinkler Corp.*, 271 F. Supp. at 558 ("Where it is intended that performance shall be within a reasonable time, one party may not suddenly and in the absence of

---

[39] On this day, the County provided Chicora with an updated list of deficiencies with the Leased Premises.

reasonable notice, terminate the contract while the other is endeavoring in good faith to perform it."); *see also Commercial Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 484 (1966) ("there exists in every contract an implied covenant of good faith and fair dealing.").

To the degree that the County would argue that it provided reasonable prior notice to Chicora under Articles 19 and 20, the outcome is the same because the Court finds the County waived any termination based upon prior notices.

Article 20 of the Lease provides that the Lease, "shall terminate," if, prior to the deadline contained in the default notice, the defaults have not been "remedied to the satisfaction," of the County.[40]   According to its plain terms, once triggered, the Lease will automatically terminate without any further action by the County unless the notified defaults were remedied to the County's satisfaction, or waived.[41]

The record indicates that the County gave Chicora at least two formal default notices, one or about May 8, 2015 and a second on August 26, 2015.  The May 8 Letter gave Chicora until June 8 to remedy all defaults, and the August 26 Letter gave Chicora until November 1.  The record also indicates that both the June 8 and November 1 Deadlines came and went, but the parties continued to treat the Lease as if it were still in effect.  This leads to one of two possible conclusions: first, that Chicora addressed its noticed defaults to the County's satisfaction and thus avoided termination, or second, that the County abandoned its demands and/or gave Chicora additional time to perform.  In either event, by engaging in this course of conduct of failing to

---

[40] The facts are clear that to the extent Article 20 is applicable, the County failed to adhere to the notice requirements of Article 20 before attempting to terminate the Lease on March 9.  Instead, the County advised Chicora on March 9 that the Lease was terminated on that day.  No 30-day notice was given.  This attempt to immediately terminate the Lease on March 9 cannot be justified or based on the County's earlier attempts to hold Chicora in default.

[41] The original deadline for completion of the preconditions to the Effective Date and possession was approximately 180 days from the date the Lease was executed.  This suggests to the Court that the 30-day notice and cure language contained in Article 20 was not intended by the parties to provide a timeline for reaching the Effective Date.

timely assert or enforce its default notices, the County waived its right to rely on prior default, breach, or other notices as a justification for the Termination Letter.

Under South Carolina law, "[w]aiver is an intentional relinquishment of a known right." *Bonnette v. State*, 282 S.E.2d 597, 598 (S.C. 1981). A waiver may be express or implied. *Id.*; *see also Lawrimore v. Am. Health & Life Ins. Co.*, 276 S.E.2d 296, 297 (S.C. 1981) (same). "An implied waiver results from acts and conduct of the party against whom the doctrine is invoked from which an intentional relinquishment of a right is reasonably inferable." *Lyles v. BMI, Inc.*, 355 S.E.2d 282, 285 (S.C. Ct. App. 1987) (citing *Pitts v. N.Y. Life Ins. Co.*, 148 S.E.2d 369 (S.C. 1966)). Actions that are "inconsistent with the continued assertion of a right may give rise to a waiver." *Provident Life & Accident Ins. Co. v. Driver*, 451 S.E.2d 924, 928 (S.C. Ct. App. 1994); *Mende v. Conway Hosp., Inc.*, 404 S.E.2d 33, 34 (S.C. 1991) (same); *Bonnette*, 282 S.E.2d at 598 (same).

The record is clear that the County repeatedly, both formally and informally, gave notices to Chicora that it was asserting defaults, imposing deadlines, and demanding curative performance, without which Chicora would face termination of the Lease. The County's communications also asserted that Chicora either missed and/or ignored such deadlines and demands, and failed to fully perform to the County's satisfaction. However, notwithstanding Chicora's alleged continued failure to honor the County's deadlines and demands, upon the passing of each deadline for any cure, the County failed to assert a termination of the Lease. Instead, the County, by word and deed, continued to affirm the Lease relationship and the County's intent to fully comply with the Lease. Again and again, the County took no action consistent with the enforcement of a default, breach, or termination of the Lease. Then, on March 9, without further notice and inconsistent with its pattern and practice to date, the County purported to immediately terminate the Lease.

Significantly, for the period commencing on the November 1 Deadline until March 8, 2016, the record is devoid of any evidence that the County acted to enforce a November 1 termination, or demonstrated by its action a belief that the Lease was not in effect.[42]  Instead, when Chicora sent its Second Effective Date Notice in December 2015 the County inspected the Leased Premises without reference to either the August 26 letter or the November 1 Deadline.  While the record from this point forward indicates the County's continuing dissatisfaction with Chicora's performance, nothing in the parties' communications indicates anything other than the County's belief that the Lease was still in effect.  For example, on January 6, 2016, the County wrote Chicora indicating a need for comprehensive resolution of all outstanding Lease issues, and requesting drawings and amounts of overages so that the County could consider the same.  Similarly, on January 22, 2016, the County provided a list of continuing project deficiencies.  The parties continued thereafter to operate as if they both intended to fully comply with the Lease.  The County's conduct immediately prior to March 9 and the Termination Letter was inconsistent with any intent to enforce a termination on either the June 8 or November 1 Deadline.[43]

For these reasons, the Court finds that the County waived its right to rely on its earlier assertions of default, breach, and notices related thereto, and termination of the Lease before the petition date.

## IV.    State of the Lease as of the Petition Date.

Having found as a matter of law that the Termination Letter was ineffective, and without other evidence of termination, the Court finds that as of the Petition Date, the Lease was still in

---

[42] In fact, neither the Chicora's Motion or the County's Motion contained evidence of any communications between the parties from late October 2015 until early December 2015.

[43] The absence of any evidence in the record for November 2015 regarding the cure of the defaults described in the August 26 letter inclines the Court to conclude that Chicora either addressed the defaults to the County's satisfaction, or the County gave Chicora additional time to cure the defaults.

effect.  The Court further finds that, as of the Petition Date, both the County and Chicora had

unperformed obligations under the Lease: Chicora had an obligation to fulfill the preconditions to

the Effective Date and to give possession of the Leased Premises to the County, and the County

had an obligation, upon receipt of the Effective Date Notice, to determine whether the

preconditions to the Effective Date had been met to its satisfaction and if so, to take possession

and commence rental payments.

Because both sides had unperformed obligations as of the Petition Date, as a matter of law,

the Court finds that the Lease is an executory contract and unexpired lease within the meaning of

§ 365.  *See In re Sunterra Corp.*, 361 F.3d 257, 264 (4th Cir. 2004) (an executory contract is a

contract pursuant to which, "obligations of both the bankrupt and the other party to the contract

are so far unperformed that the failure of either to complete the performance would constitute a

material breach excusing the performance of the other." (internal citation omitted)); Vern

Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).

## V.    Assumption of the Lease.

### A.    Assumption of Executory Contract's and Leases.

When a lease[44] is in effect upon the petition date,[45] a debtor-in-possession's right to cure a

default exists regardless of whether state law or the executory contract itself provides the right to

cure.  *See generally In re Circle K Corp.*, 127 F.3d 904, 909 (9th Cir. 1997) (recognizing that the

purpose behind § 365 is to "balance the state law contract right of the creditor to receive the benefit

of his bargain with the federal law equitable right of the debtor to have an opportunity to

---

[44] A lease is but one type of executory contract that may be assumed or rejected pursuant to § 365.  *See generally* 2 Norton Bankr. L. & Prac. 3d § 46:1, Executory Contracts and Leases In General (April 2017 Update).

[45] If an executory contract or lease has been terminated prepetition, and the termination is complete and not subject to reversal under the terms of the document or state law, then the terminated contract or lease cannot be assumed pursuant to § 365 because there is nothing left for a debtor to assume.  *See, e.g., In re Gloria Mfg. Corp.*, 734 F.2d 1020, 1020-21 & n.1 (4th Cir. 1984); *In re Greenville Am. Ltd. P'ship*, 2000 WL 33710874, at *4.

reorganize.") (internal citations omitted).  Using § 365, a chapter 11 debtor "may assume or reject,"

an executory contract or unexpired lease either by motion, or in its plan pursuant to § 1123(b)(2).[46]

Once assumed, the rights of the parties to an executory contract are governed by state law unless

there are contrary provisions in the Bankruptcy Code.  *See Wainer v. A.J. Equities, Ltd.*, 984 F.2d

679 (5th Cir. 1993) (internal citations omitted); *cf. Butner v. United States*, 440 U.S. 48 (1979).

A debtor's ability to use § 365 to assume or reject a contract, "is vital to the basic purpose

of a Chapter 11 reorganization."  *N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 528 (1984).

Rejection of a burdensome contract "can release the debtor's estate from burdensome obligations

that impeded a successful reorganization."  *Id.*  Likewise, assumption pursuant to § 365:

> is intended to provide a means whereby a debtor can force another party to an
> executory contract to continue to perform under the contract if (1) the debtor can
> provide adequate assurance that it, too, will continue to perform, and if (2) the debtor
> can cure any defaults in its past performance. The provision provides a means
> whereby a debtor can force others to continue to do business with it when the
> bankruptcy filing might otherwise make them reluctant to do so. The section thus
> serves the purpose of making the debtor's rehabilitation more likely.

*In re Nat'l Gypsum Co.*, 208 F.3d 498, 505–06 (5th Cir.  2000) (citing *Richmond Leasing Co. v.*

*Capital Bank, N.A.,* 762 F.2d 1303, 1310 (5th Cir.1985)).

The right of a debtor to assume an executory contract is expressly provided by the

Bankruptcy Code, and the decision whether or not to assume or reject an executory contract rests

exclusively in the hands of the debtor-in-possession.  This statutory privilege "vests the debtor

with a considerable amount of power."  *In re Nat'l Gypsum Co.*, 208 F.3d at 505–06.

---

[46] Title 11 U.S.C. § 1123 (b)(2) provides that, subject to §1123(a), a chapter 11 plan may:

subject to [§ 365], provide for the assumption, rejection, or assignment of any executory contract or
unexpired lease of the debtor not previously rejected under such section . . . .

In the unlikely event a debtor fails to either accept or reject an executory contract, the contract will "ride through" the
bankruptcy proceeding and be binding on the debtor even after a discharge is granted. *See Federal's, Inc. v. Edmonton
Inv. Co.*, 555 F.2d 577, 579 (6th Cir. 1977); 2 Collier on Bankruptcy, ¶ 365.03, p. 365-22.  In this situation, the
nondebtor party's claim will survive the bankruptcy proceeding.  Vern Countryman, *Executory Contracts in
Bankruptcy: Part II*, 58 Minn. L. Rev. 479, 487 (1974).

A creditor with notice of a debtor's intention to assume a contract must timely voice its objection, as the burden is on the non-debtor party to assert any defaults prior to the assumption of an executory contract. *In re Arriva Pharm., Inc.*, 456 B.R. 419 (Bankr. N.D. Ca. 2011); *In re Diamond Mfg. Co., Inc.*, 164 B.R. 189, 199 (Bankr. S.D. Ga. 1994) ("[t]he nonbankrupt party [to an executory contract] bears a burden to assert any defaults prior to the assumption.").

"When a bankruptcy court approves the assumption of an executory contract, it necessarily finds that no uncured defaults exist." *In re Cellnet Data Sys., Inc.*, 313 B.R. 604, 606 (Bankr. D. Del. 2004), supplemented by 2005 WL 1331257. Having failed to object to assumption of an executory contract in a plan, the non-debtor party cannot raise any pre-assumption defaults due to the *res judicata* effect of confirmation order. *In re Arriva Pharm., Inc.*, 456 B.R. at 419; *In re Goody's Family Clothing, Inc.*, 443 B.R. 5, 16 (Bankr. D. Del. 2010) (Upon approval of a debtor's assumption of an unexpired lease, the court necessarily finds that no uncured defaults exist. As a result, a debtor who has assumed a contract in its plan is no longer liable for pre-confirmation defaults.); *see also NCL Corp. v. Lone Star Bldg. Centers (Eastern), Inc.*, 144 B.R. 170, 178 (Bankr. S.D. Fla. 1992) (When a debtor assumes an executory contract, it assumes all prospective rights and obligations under the contract, not liability for pre-assumption defaults. Uncured prepetition defaults do not become "assumed" post-petition obligations.).

### B.    Chicora's Assumption of the Lease.

In Article VII of the Confirmed Plan, Chicora states its intention to assume all of the executory contracts listed in Schedule G of its Schedules. The Lease is the first executory contract identified on Schedule G. The Confirmed Plan also provides for the treatment and payment of any monetary defaults arising under any assumed contracts as administrative claims, as required by the Code.

41

The Confirmed Plan did not reference or provide for the curing of any prepetition, nonmonetary defaults, such as those alleged by the County, under any of its executory contracts, including the Lease.  In addition, because the Lease is an unexpired lease of non-residential real property, any default arising from Chicora's prepetition failure to perform a nonmonetary obligation, if curable, need only be cured prospectively.  *See* 11 U.S.C. § 365(b)(1)(A); § 9B:6. Assumption—Generally, 2 Bankruptcy Law Manual § 9B:6 (5th ed.).[47]

The County had actual and timely notice of the terms of the Second Plan and Disclosure Statement, and actual and timely notice of Chicora's proposed treatment of the Counterclaims and the Lease, including Chicora's expressly stated intention to assume the Lease.[48]  Despite having actual notice and ample opportunity to object, the County failed to file an objection to the Plan as required by the Order entered on October 4.  *See supra* at ¶ 48.

To the extent that the County would argue that its pleadings filed in the Adversary should be treated as an objection to the Confirmed Plan, the Court would disagree.  While related, the Adversary and Bankruptcy Case are two different proceedings.  While the focus in the Adversary was whether the Lease was effectively terminated prepetition and the resulting consequences, the focus in the Bankruptcy Case was Chicora's efforts to reorganize and confirm a chapter 11 plan – which included assumption of the Lease for the benefit of all of its creditors.

---

[47]   In addition, the requirement of curing any defaults, including nonmonetary defaults, may be subject to waiver by the failure to assert the defaults prior to assumption.  *See* § 9B:6. Assumption—Generally, 2 Bankruptcy Law Manual § 9B:6 (5th ed.).

[48] This is evidenced by its Abstention Supplement, filed by the County in the Adversary in response to the Second Plan and Disclosure Statement and to supplement its Abstention Motion.  In addition to having actual and timely notice of the contents of the Second Plan and Disclosure Statement, the certificates of service filed in this case indicate that the Second Plan and Disclosure Statement were served on counsel for the County.  *See generally Strother v. Lexington Co. Rec. Comm'n*, 504 S.E.2d 117, 122-23 and n.6 (S.C. 1998) (extensive discussion of actual vs. constructive, and other forms of notice).

The Order Conditionally Approving the Disclosure Statement, which was served on counsel for the County, expressly provided notice of the deadline by which written objections to the Second Plan and Disclosure Statement were required to be filed in the Bankruptcy Case. No such objection was filed by the County.[49]

Even if the Court were to treat pleadings filed in the Adversary as an expression of an objection to the Second Plan, the County never prosecuted any objection to confirmation. The County's counsel was present at the January 4, 2017 confirmation hearing, and the County failed to assert any objection to confirmation (or indeed, even bring any objection to the Court's attention) at this hearing.

To the contrary, it appears that, despite having actual notice of the Confirmed Plan's provisions and the assumption of the Lease, the County made a calculated decision to ignore its treatment proposed by Chicora in its Confirmed Plan and Disclosure Statement, instead relying completely on its argument in the Adversary that the Lease was effectively terminated prepetition. Considering the effect of § 1141, the County is bound by the consequences of the Confirmed Plan.[50]

---

[49] Furthermore, Bankruptcy Rule 3020(b) explicitly provides for objections to confirmation of a Chapter 11 plan to be served on a number of parties, not merely a party opponent in an adversary proceeding, indicating the need to bring any objections to the attention of various interest holders in the chapter 11 case. Fed. R. Bankr. P. 3020(b).

[50] Recent comments made by counsel for the County illustrate the County's misimpressions regarding the relationship between the Adversary and the Bankruptcy Case, and its own role in the Bankruptcy Case:

> By Mr. Cooke: What's occurred to me is that, for the first year of this litigation, we haven't been really part of the bankruptcy. We have been in an adversary proceeding, which is kind of like a little shell within the bankruptcy. Chicora had months of negotiations with its creditors, and we weren't party to those. . . . . And I can see now why the Court thought "well, the parties are about to work things out," it makes sense it's a win-win possibility. And I should've probably been more assertive back then. Next thing you know, [the Second Plan] comes out where now all of a sudden is Plan A, "we're going to beat the County in this litigation and make them move back in," Plan B is if that doesn't work the property will be sold . . . . And we [the County] didn't have standing even to comment on that, it was just done. And so now that the Court has found that the Lease wasn't terminated on the date of the petition . . . . This [Second Plan] by Chicora is shocking. It's astounding . . . .

Excerpt from Hearing held on May 9, 2017.

The Second Plan and Disclosure Statement process cumulated in the Confirmed Plan being confirmed on January 10, 2017.  As a consequence of its failure to object to the Confirmed Plan, as a matter of law, the provisions of the confirmed Plan bind the County, and the County is barred by *res judicata* from now attempting to relitigate any issues surrounding Chicora's assumption of the Lease.  *See* 11 U.S.C. § 1141(a) (the provisions of a confirm plan bind a creditor whether or not it has accepted the plan); *In re Varat Entrs., Inc.*, 81 F.3d 1310, 1315 (4th Cir. 1996) (bankruptcy court's confirmation order is treated as a final judgment with *res judicata* effect, and parties who failed to raise before confirmation issues that that should have or could have may be precluded from later doing so); *see also In re Ducane Gas Grills, Inc.*, 320 B.R. at 335.  This includes attempting to challenge the assumption of the Lease, as well as raising prepetition defaults or breaches that the County failed to raise as part of the confirmation process.

---

Unfortunately, the County's belief that it "did not have standing" to object to the Second Plan was incorrect as a matter of law.  As a creditor of the estate holding a claim that was treated in the Second Plan, and as the counterparty to the Lease being assumed in the Second Plan, the County, as a matter of fact and law, had standing to raise its objections to Chicora's proposed assumption of the Lease.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part Chicora's declaratory judgment claim, and holds that the Lease remained in full force and effect as of the Petition Date, that the Lease is a valid and binding obligation of the County, and the Termination Letter and the County's attempted lease termination were of no force and is null in effect.

The Court denies the remainder of Chicora's declaratory judgment claim, as there is insufficient evidence for the Court to make these determinations at this time.  The Court finds that Chicora's demand for specific performance is superseded by the assumption of the Lease in the Confirmed Plan, and appears moot at this time.  Finally, the Court denies the County's request for summary judgment.

**AND IT IS SO ORDERED.**